Welcome to the United States Court of Appeals for the Fourth Circuit. We have four cases on for argument this morning. Before we get started, I want to welcome our colleague from the United States District Court in Maryland, Judge Matthew Maddox, who has graciously agreed to take a break from his very busy day job to join us here today. He tells me he drove up late last night after wrapping up a trial. And so I really appreciate your being here. It's an honor being here, Chief Judge. Thank you. All right. Our first case up for argument is 23-2296 Fernays v. Isle of Wight. I hope I'm pronouncing that correctly. Mr. Sherman. Chief Judge Diaz, Judge Niemeyer, visiting Judge Maddox. My name is Joseph Sherman and I represent the appellants, Brian and Sue Fernays. Ms. Fernays is with us in the courtroom today. And had the county spent a third of their energy and resources and efforts complying with federal law and the Clean Water Act, the county would be healthier, wealthier, and wise. Instead, they've spent over a quarter of a million dollars avoiding compliance with the Clean Water Act. And we've got a growing sinkhole on private property and a litigation position the county offers that's illogical, unworkable, and offering a misincentive to other rural jurisdictions to avoid compliance with the Clean Water Act. And so the trial court's opinion in this case, which it took two years to render after cross-motion for summary judgment, makes a large mistake in that it accepts the logical fallacy that the covenants signed as an unequivocal offer by the developer of this subdivision and recorded as part of the subdivision plat are a license to use the drainage easements rather than an easement to control and maintain the drainage easements. A license has its features in the law found as personal and revocable. The covenants clearly say on the very first page that these covenants are irrevocable and run with the land to all future grantees of the subdivision. Is it your position that the county had no choice but to accept the easement? Or, I mean, when these documents were drafted and recorded, what was the state of affairs with respect to the county's right to either accept or reject the easement? They had full negotiating power to accept or reject. You'll notice that the covenants are unilateral in that they're signed just by the subdivision developer. They're not accepted at that moment by the county. And so what the county does is it incorporates those into the plat. So when the plat's recorded, it's saying we are accepting the covenants and we are recording the plat to hold. Tell me what you think are the operative documents by which the property was conveyed and accepted by the county. I understand you're simply showing the plat and recording it is your argument. I think that's what you just said. But if there's nothing more than that, I'm not sure that gets you anywhere. Well, I tend to agree with you. I think that there's got to be, whether expressed or implied, it's got to be an offer and there's got to be an acceptance. And the common law will allow unequivocal acts of any kind to... I understand, but I want to know your evidence you're pointing to. I gather the only evidence is this plat and the recording of the plat. There's no document that says we are beyond the plat that we accept anything. And if you look at the plat, there's no dedication on it. Well, as it speaks to acceptance, if I can take them one at a time, the acceptance... No, no. Give me the dedication. Where's the conveyance? The covenants expressly say we are irrevocably giving you the right to use the drainage easement and the unilateral offer by the developer is accepted as part of recordation of the plat. So I think that the covenants and the plat are the offer. That's the offer. To the county, you're talking about the plat is a subdivision. And there's private property retained on that, full fee, simple private property. And this easement is on two pieces of private property. It's not even a public piece of property, no public access. The property is fully owned by lots 31 and 32. And there's an easement going across that 10 feet on each side. And for the drainage, but there's no language of dedication, whereas there is on other portions. I'm just trying to find out where you're saying the word dedication was used or the word conveyance is used and where the county says we accept. Right. So taking a step at a time, this is a post Burns world. In 1984, the Virginia Supreme court decided the Burns case, which was a tortured application of dedication because the equities were different and they wanted the outcome to benefit the developer in some way who was losing all of his property rights to the county. So the Burns case came down in 1984. In 1986, I was born. In 1987, you were appointed to the bench. In 1989, this plat was recorded. When was I born? I was a virgin by rebuttal. I had reserved some time for rebuttal, your honor. The unequivocal offer is in the covenants. It says I will offer irrevocably forever and for all running with the land forever. He wouldn't need to give an easement to himself. If I can't own an easement in my own land, the doctrine of merger would merge those titles. So the offer is clearly expressed in the covenants and the county's accepting it in three ways. There's three types of acceptance in this case. By recording the plat, that's an expressed acceptance saying, we're accepting these covenants. We're incorporating them by reference and we're recording this plat and plat says that we're taking open spaces and that's why Burns is important because in 1984 Burns, I mean, the first thing you just sort of jumped out of it, the plat shows public conveyances, the roads, the park, there's a dedicated five, a five foot easement on there for widening the road. Right. That's, that is dedicated to the public use. Right. But I saw nowhere in there where this drainage easement was conveyed. Because the drainage easement was maintained. Because the Burns case in 1984 said that the statutory. Give me evidence in this case. No, I will. Because they, they, in 1984, 1989, they were, they were based, they knew about Burns. We have to assume they knew about Burns because Burns stripped the subdivision or the plat, the dedication by plat statute was, was reduced by the Supreme Court of Virginia to just surface rights. They, they held in that case that you could not convey subsurface rights. So knowing that they use the strongest, broadest language possible in 1989 to try to convey all the surface rights possible to the county, which is why they use the words alleys, open spaces, even though, even though they caught, they copied the language of the existing statute and added those words to it because they were trying to convey the broadest rights possible. The county wanted the most rights possible. But those descriptors that you just talked about, don't, don't really describe what we have here, do they? Well, I agree. I think they couldn't because the way that the Burns outcome informed their decision, they couldn't take subsurface rights expressly. So on the plat, so what they did is they said, these covenants were taking the broadest language possible for use by the public and the, and the county. And we're accepting that. And we're on this plat, we're notating drainage easements and we're accepting dedication of these open spaces, these alleys, these, these streets, these roads, all the surface rights possible in the subdivision. So looking at it in the, in the lens of what was going on in the 1980s is that they knew the, the Burns decision limited their ability to, to dedicate by plat to just surface rights. They took as the broadest possible surface rights in the subdivision. And then they incorporated by reference, it's on the plat, the incorporation of the covenants, the unilateral offer of the developer. Then they go on. So the, the, the plat and the covenants are strong evidence of dedication, considering the post Burns world, where you're not allowed to take subsurface rights by plat. And then the acceptance is proven by 35 years of public use. All the cases that speak to acceptance by public use, talk about the public in general using the land. And there's no dispute that the public's been draining over nine acres through this easement for 35 years. The Brown case, the Ocean Inn case and the Meredith case all talk about the public use. It doesn't need to be. When I read the plat is that the drain to this line only was from the street. This, this pipe went up to the street at a drainage basin thing there. Now where the water came into the street, it could have come from any place. It's just a flow of land. I mean, it could have come down the hill from here and there. I don't know what the topography is, but the fact that the water came down from the sky and landed on the top of the mountain and flowed down various driveways into the street, this drainage drained from the street into the creek. Well, and so that's what the Clean Water Act now means to regulate is direct discharge into impaired waterways. And so it was the public policy changed 40 years later where they realized that the curb and gutter that was collecting nine acres of the subdivision and channeling it through curb and gutter under the street to this discharge now needed to be regulated by the federal government and the Clean Water Act. Rather than comply with that, they wanted to bury their head in the sand and disclaim any interest in drainage easements to avoid compliance with federal law. So that's why we've got this public policy change 40 years later, which is evidenced very clearly in the orphan outfalls document that's at the very beginning of the record because they made this policy shift to the detriment of their community. Can I ask you a question about the Virginia statute that talks about the recordation of plats being evidence of dedication, which appears to be your principal argument here. But that statute, if I'm reading it correctly, talks about easements that create a public right of passage over the same. That's not what we have here. And that's what the Burns court found. And so that's why in 1989 five years after the Burns decision, they knew they couldn't convey subsurface rights expressly on the face of the plot. What they did is they wrote it in the covenants, they accepted the covenants and they recorded the plot with the broadest possible rights over the surface rights within the subdivision. So I don't think they created public passage at all. There's nothing in the documents that creates public passage. To the contrary, the plot shows fee simple ownership in the two lots. The easement is split down the middle by the lot line and the fee simple on lots 31 and 32 is owned by those persons subject to the easement. But that's not a public way. But the easement is for the public use. The covenants expressly say that the easement is for the public use. I wouldn't need an easement in my own land. I can drain my own land without an easement to the ravine. The covenants expressly say this is for the public's use in the covenants, 226 of the record, that it's irrevocable, it's transferable, which means it can't legally be a license, and it's a right to use land for a specific purpose, which is the public drainage of the subdivision and those nine acres of the neighboring subdivision. The result otherwise would be absurd, that the Fernays can brick up the pipe and send the nine acres of water somewhere else. It doesn't make any sense to think that this is a revocable license that they can revoke at any time when the document expressly says it's irrevocable, it's assignable to others, it runs with the land. And if it was revocable, that means I could block it up. And if the intention was to grant a revocable license, then how would that have been accomplished in the context of the 80s? Well, a revocable license is personal to just you and you can hunt my land. And so it could be verbal or written, but it's personal to you. It's not assignable, it's not transferable, and it's revocable at any time. It's permissive in nature. And so in this case, it says it's irrevocable, it's running with the land and it's binding on all the future owners of the subdivision. That's not something that Carpenter Development can revoke. So in this case, it would have been a separate document that would have transpired between the developer and the county? Well, when I do it, I write a nice letter and say, we built the fence five feet onto my land and you're free to use it, to get your lawnmower back there, but it's not binding on anybody if I have to sell the house down the road. Thank you. I mean, this is a very strange situation because obviously someone should have been responsible for maintaining and upkeep of the stormwater drainage structure that was on this property. And I guess there are two options. Your argument is that in one way or another, the county accepted that responsibility either expressly or otherwise by virtue of public use. But the other way, I suppose is this is now an HOA subdivision. Is that right? That where these people live is, is it an HOA? It predates the HOA phenomenon. So nowadays the modern, and there's a footnote in the briefing on that. The modern ordinance requires that the HOA accept it. But is this particular subdivision now controlled by an HOA? Not that I know of. Okay. So what about the developer? I thought the developer reserved certain properties for maintenance and structures, right?  he only reserved the statutory right to replant the easements in the event of a resubdivision. If there was a rearrangement of the lots, then he reserved the right, which was consistent with the statute. Why doesn't he have the obligation to maintain the undedicated? Well, he's dead for one. And two, he's dead. Was it a company or an individual? It was a company. And the, I think that the point of the covenants was to give the easement to the, to the public in general. It says easement, it uses the word easement. It doesn't use the word license. It uses the word easement and it says it's for the public at large. And so to the extent that he retained an easement in his own land, that would, that would be extinguished by the doctrine of merger. You don't need a separate interest in your own land. All right. Thank you, Mr. Sherman. Mr. Green. Good morning, Judge Niemeyer, Judge Diaz, Judge Maddox. Thank you for having us here today. I'm Ross Green. I'm with Pender and Coward. I'm here representing Isle of Wight County. The problem with the case here, Your Honor, that I think everyone sees here is that dedication of private property to public use in Virginia is not an easy process in the law as far as unimplied dedication. It's actually quite straightforward about dedication by plat. This would not be an issue if it said on that plat, 20 foot drainage easement dedicated to Isle of Wight County. It doesn't say that. It doesn't say it anywhere. There's no document anybody can point to in this that says that that easement was dedicated to Isle of Wight County. It just doesn't. Who had, in your judgment, who had the duty to maintain the drain? Your Honor, if it's anyone here, it's the members of the subdivision because the declaration. Was there an organization? I'm not. I believe there was not a homeowners association for this at that time, that there was simply no homeowners association. How do the persons who purchase and fee simple have an obligation to maintain the sewers? If they have any, Your Honor, it would be in the covenants and restrictions. Well, I'm looking at them and it says, it's, you know, it says the easements. It says it's for the benefit of all owners. That may be freely used by them in the Isle of Wight County and by anybody else almost. Basically anybody can use it, but I'm wondering who has a responsibility to maintain it if there is a problem. And I suppose a pipe in a drainage here, I don't know if it's a sinkhole, it's more of an erosion. A sinkhole is thought of as dissolved solids underneath and there'd be catches, but it's in a heavy erosion because the pipe broke, right? I agree, Your Honor. It's more like an erosion problem. But I mean, the picture looks like a big erosion, but the pipe broke. Pipes do break. And the question is now if a pipe breaks, who comes and fixes it? Your Honor, at this point, it would be the owners of the lots or the other owners of the lots in the area. This is not a perfect situation. We are in a odd niche because of drafting that was just not done correctly by this developer. If it said dedicated to the county, the county would take care of it. If it said, you know, essentially better easement terms about a drainage easement, we would know who it would be. I mean, aren't there Virginia cases that say that, well, dedication can occur expressly. And your argument is that that didn't happen. The plat didn't say dedication and easement. The county could have, at some point, exercised jurisdiction, I suppose, and somehow acquired the property or the easement after the fact. There's no indication that that happened here. And then the third way, under the case law is by implication for public use of requisite characters, what this ocean islanding case from Virginia says. And don't we have that here? You've got nine homeowners, tracts of land using the easement for the benefit of that limited subset of the public. And is that sufficient to then put the onus on the county to maintain the drainage infrastructure? I don't think so, Your Honor. As you identified, it appears to be a limited subset. It's, if anything, it's the subdivision. It seems like it's actually less than the subdivision. It's not the general public using this thing. And even if it were, under the case law in Virginia, public use is not sufficient in this type. You have to have an exercise of dominion and control beyond that. And we don't have that here. If you look at 32 Page Avenue Condo Association and some other cases, they clarify that it's not just public use. In something like this, where the use is shared, it's a drainage. Do we know how many lots drain into this location? I understand if there is evidence of that, Your Honor, it would be that there were nine lots approximately. So nine lots basically were shedding water, so to speak, that went into the street and down the drain and into the pipe. It may be more than that. It may be that. How many lots are there in the development? Off the top of my head, I don't recall, Your Honor. I'm sorry. I should know, but it's many more than nine. Well, I know I can see it here. I was just curious. The gist of it is there's no exercise of dominion or control whatsoever by the county. And there's no use by the county. The county, it's a state road by statute. All maintenance, supervision, jurisdiction, etc. of the road is not the county's. So that's not the county. As you've identified, the land is not the county, and the creek it goes to is not the county. The county isn't doing anything here. And the plaintiffs say in their complaint that the county's never maintained it, worked on it, done anything with it. The pipe was installed by the developer, essentially belongs to the developer, not us. It's under the pipe today. Is it fixed? No, Your Honor. When the pipe was installed, was it inspected by anybody, any representative of the county or the state? No, Your Honor. If there were any inspections, it would have been done by the state, not the county. And that's not enough in your view to imply any kind of dominion or use or acceptance of the system? No, Your Honor. Burns makes clear that the pipes and the easements are different, and the pipe, you know, essentially is the private property of the installer. If it's not that, it's a fixture to realty and becomes part of the realty and is owned by the lot owners. Either way, it's not the county's pipe. So what you essentially have is a Grand Canyon type of thing here that's mostly on the easement area, a little bit is beyond the easement, from what I can see in the drawing. Well, Your Honor. And you have two owners that have this new scenery there as where this erosion is. The pipe comes down to a certain area and then drains into this canyon, right? Well, Your Honor, we object to that drawing. I don't think it's correct for the other side to have put it in their pleadings. That's not a record document. That was an excluded report by one of their experts. That drawing was essentially submitted as a one page report. My point is that even the pictures show that it's mostly confined to the easement area, but it's starting to erode further in on both properties so that the damage being done, if there's to call damage, is creating this canyon. And I guess it's just going to continue with each rain, right? That's the plaintiff's position. That's the appellant's position. Well, you don't deny that, do you, can you? We don't... You don't need to admit it. That's all right. Thank you. Thank you, Your Honor. Just to clarify, obviously, they had moved for summary judgment about causation and some other things. We disputed that. That ruling isn't before the court. We're only talking about ownership of the easement as far as that issue right now. So that's essentially our position, Your Honors. We've never used it, and we don't use it. And all of these other things beyond as far as implication or stop. Does the county own anything there? No, Your Honor. State is only the state, right? That's my understanding, Your Honor. All of the rights in the bundle of sticks are essentially statutorily conveyed to the state. I mean, how do you own property if you have no management supervision control? No, I'm not asking that. I'm just asking your position. I mean, the roads were dedicated and received by the state, not the county. Yes, Your Honor. So accepting that you don't represent the Frenets in this case, what remedy do they have if not against the county? Your Honor, I would submit to you that it's nothing unusual in coastal Virginia to own a waterfront home and have an erosion problem and have to deal with that yourself. It's not anything out of the ordinary to have a ravine on your property. One of these properties already backs up to a ravine, the other backs up to the creek. This isn't anything out of the ordinary to have to deal with erosion from drainage. So as far as lack of a remedy, this is a very niche situation. But your understanding, it seems to me, if there was the developer who would be the closest to having liability, what's the status of the developer? If I recall correctly, the developer is a defunct corporation, but it may have some successors, Your Honor. Obviously, the appellants here, for whatever reason, have not chosen to pursue anyone else about this. For some reason, they've decided to pursue the county, even though the county lacks any connections. This is a little bit like just buying a piece of property. I buy 100 acres of property with a drain on it, and the drain goes bad. If I'm the owner of the property, I have to repair the drain. You buy it as is, so to speak, and if you don't want the erosion, you have to repair it. Here, there is a drain going on it, and that would seem to apply that principle, except that the plot that the two owners gave, they gave an easement to someone to come on that to maintain that drain. It looked like it's reserved to the developer. That is essentially our position, Your Honor. The developer provided the easements. The developer put in the drainage pipe. It's essentially the developer's problem and the landowner's problem to go after them to fix that. That's my understanding. Mr. Green, we're talking about public use, and you seem to suggest that if there had been much more extensive use of the drain, the result might be different. Is there a number? How many members of the public need to use this easement in order for, if any, for you to concede that the county had some obligation here? Your Honor, I would submit to you that the case law says that it's not the number that matters. One, I don't think this is really the general public, but two, there has to be something more than that. When use of something like this is not exclusive, there has to be exercise of dominion and control. You can't just, the CCC Road case that we cited on brief and others, all indicate you can't convert private property to public property or public interest in property merely by the use of the general public. You actually have to have some further government action in order to essentially seal the deal. That's why it's so clear here when they say the county never repaired it, the county never maintained it. If the county had been offered it, which we don't think it did, and then had maintained it, then you would have an argument for an implied dedication, but the county never did anything here. When you look at the cases that they're talking about, it's always doing something just more than just public use. Mind you, we've never used it. It's not our water. We're nowhere in there. We're a step past. There's no proof for the step before we get to this step, but if it did, there's nothing there. We didn't maintain it. We didn't build on it. All these other cases are things like you improve it, you put street lights on it, you paint it, you do other things with it as the government evidencing the public use to show it. You don't just get it because some unknown number of people traipsed across it. Else, the government would have rights across innumerable properties whenever it wanted. Just because people in the general public went across it, you could say that it belonged to the government. That's not how it works. There has to be something more than that. If you could, could you, if you're in a position to, describe the process that preceded the Board of Supervisors signing the plot? Like, was there a formal resolution as to that before a signature is placed on the document? There is a resolution accepting the plot, but it, well, there is a resolution, sorry, there is a resolution dedicating, or, I'm sorry, there is a resolution putting the road into the state highway system. Essentially, the road gets built, the, oh, I'm sorry, Ron, I'm skipping steps. Are you asking about the plot? The Board of Supervisors signing the plot, yes. Or some agent of the Board of Supervisors. Yes, Ron, it's reviewed by the county, approved, and then signed, and there's no dispute here that the plot was signed in that way, and that it thereby did publicly dedicate the things on it that are publicly dedicated, it's just not this. But if this had been, if the language as to this drainage area had been, the right words had been used, dedication made it more explicit, that would have been, that signature would have been an acceptance by the county. That would have done it, because you would have had an accepted dedication by PLAT, just like you had for the things that are actually dedicated on here, like the thing, there's a five-foot strip for road widening here that clearly says dedicated. And that's the problem, Your Honor, that's the crux of it. But the key word here, Your Honor, that I think we have to focus on is unequivocal. That's the rule for this process. The media general cable case from 1990 says dedication of a property interest to a public entity only occurs when the owner unequivocally offers that interest to a public entity and for public use, and that entity unequivocally accepts it. We don't have any of that. We have this strange situation of inferences trying to point to various things and none of it's unequivocal. It's all subject to debate. It's not clear, it's not unambiguous, it's not free from uncertainty. This thing is unclear, ambiguous, and uncertain. Nothing about it is unequivocal. To go on to it further, if you look at, there is another document that also could have referenced dedication that we haven't discussed which is a subdivision agreement. It says, it's mutually understood and agreed that the approval of a final plat or plats of this subdivision shall not be deemed to be an acceptance by the county of any street alley public sewer or other physical improvement shown on the plat or plats for maintenance, repair, or operations thereof, and the owner shall be fully responsible therefore and assume all of the risks and liability thereof. This thing is a storm sewer. When you look at the 1984 Burns case, it contains specific language dedicating a storm sewer and other types of sewer and water lines etc. Even if this were somehow deemed to cover all of these bases, the county would be relieved of any maintenance obligation by this bond agreement. It's clear that this was not any acceptance of any public sewer of which this is a storm sewer. The intention was that the owner which was the developer, shall be fully responsible therefore and assume all of the risks and liabilities therefore. Where is that in the record? 214. I believe that's correct. Thank you, Your Honor. So, there's nothing unusual going on here, Your Honor. This is as I think opposing counsel noted and they note in their briefs, in the modern world, when this is done clearly, this is all subject to being taken care of by the homeowners association. It's not the county's responsibility. Just to throw this in there, opposing counsel keeps talking about the Clean Water Act. The Clean Water Act has nothing to do with this. There's nothing in the law of the Clean Water Act. Maybe in view of the fact that fee samples were conveyed here and there was nothing reserved by the developer, it might be that the easement would have to be construed to be a mutual easement by lots 31 and 32 for them to mutually repair a drain which is right on the line, on the property line. I agree with you. If that were on one person's entire site, it seems to me he takes the land as it is and however unless somebody else has agreed to maintain it, the landowner is responsible. Yes, Your Honor. There's talk about it being two ten foot drainage easements but really when you look it's a 20 foot easement at 10 foot on each side. Yes, Your Honor. And it could be mutual easements for the two properties. Yes, Your Honor. The only other issue, Your Honor, while I have a minute remaining is the other side, although they did not bring it up in their opening, has also appealed or attempted to appeal the exclusion of their witness, Mr. Gruelle. Your Honor, there's no basis for Mr. Gruelle's opinion. Our position would be that he is correctly excluded under Rule 702 and 703. There were multiple bases for his exclusion including the reliance on experts who were already excluded and experts who hadn't been designated in addition to any issue with his comparable sales and the court also found that his methodology was incorrect. You can't just put a sales comparison label on something in order to cover basic Ipsit-Dixit speculation. But thank you very much, everyone, Your Honors. I appreciate your time very much and the county asks that you please affirm the ruling of the trial court. Thank you, Mr. Green. Mr. Sherman, you've got some rebuttal time. Before you get started, can I just ask you what is your response to that page 214 agreement that the county was accepting nothing? Right, so that's after the fact. That's in 1992. That's three years after the recordation of these documents. It appears to be a form agreement. It's not the form for this one. It's a form for another one that they've recorded under affidavit as being substantially similar. So, I'm not sure that it has any bearing on this in that it's an after the fact form where the developer's looking for a bond to build the subdivision. The deal's been struck and speaks for itself in the 1989 transaction which says on the plat easements, in the covenants easements, and within the easements, it says for public use. And then they've continued to use it for public use for 35 years. So, taken in the context of Burns, if we put Burns before rather than after, we don't try to interpret this through Burns, but rather we realize that this plat was written post Burns because of Burns, then it makes sense that Burns limits the statutory plat to surface rights. They say, alright, how do we get subsurface rights in a post Burns world? And they say, let's take the broadest possible surface rights and then incorporate the covenants which say easements, the plat says easements, and the covenants say for public use. You know, the first comment I heard was, if someone said 20 foot drainage easement, that would solve it. Well, the plat says 20 foot drainage easement and incorporates the covenants as restrictions, and it restricts irrevocably for all future assigns to run with the land, paragraph 18, easements, easements shown on the plat for drainage. For the benefit of the owner of all the lots, as well as the general public. So, in a post Burns world... I know, but that doesn't convey it. Well, I think that's the... To me, it's a little unclear who owns the easement, but an easement is the right for somebody to go on, but it does not convey it to the county and clearly the county is not assuming maintenance under that clause. Looking at that clause, I don't read that at all. Judge, the Jenkins case against... No, I'm talking about the language here in the covenant. Tell me what language has the county absorbing the responsibility to maintain the easements. Well, with the right comes responsibility, and that's what the Jenkins case said in 1987 against the county of Shenandoah, that when you accept the right, you accept the responsibility. They don't have... They say it's for the benefit of... Also, it says for the benefit of the owners. Well, I mean, it's a torture... Do the owners have the responsibility? How many owners are there in that area? Division. I think there's over... I think there's close to 50. Okay, say 50, just for discussion. So, it's for the benefit of the 50 owners. Do the owners have the responsibility to maintain that drain? Well, it doesn't say that either, right? It says it right there where you were. No, it doesn't say... It can freely be used by the county Isle of Wight for the benefit of the owners of said lots, and there are signs. As well as the general public. Right. That's typically what the county I think would do, is use the stormwater tax to have a reserve to repair the riprap. If this had been repaired in 2018 when it was first reported, it was just the riprap at the lip of the pipe near the ravine that needed replenishment. It wasn't the whole section collapsing, collapsing at a time. The reason they let it collapse was to avoid some semblance of ownership, because they didn't want to comply with the Clean Water Act. Because they don't want to regulate the quantity and quality of discharge into an impaired waterway. So... You just mentioned the stormwater fee or tax. Is that any evidence one way or the other that the county assumed responsibility if they were collecting fees and or taxes? I think that evidence is dominion and control. I also think that the fact that they've offered it to VDOT evidence is dominion and control. Who collects the tax? The county. It collects the stormwater tax. Assesses the tax on every lot in the subdivision and the county. So for the general public to benefit from the road and that drawing that you showed earlier... So I own a piece of property, 25 acres, and I have a storm drain going on my property, I have to pay the tax, right? Well, I don't know. You just said, right? I have a storm drain on my 25 acre piece of property. I think that you have to pay the taxes that are levied against the general public. Yes. So your argument is that because I have a storm drain now the county has to come in and fix my storm drain when it's broken. If it's platted to the public, there's admissions in the record that this is a public infrastructure. That wasn't my hypothetical. My hypothetical is a person owns a piece of property that has a storm drain that's subject to the tax. And you said that they don't have a duty to maintain that. Judge, you could have a private or you could have a public. And that's the distinction we're arguing in this case. And so in your hypothetical... This is not dedicated to the public. It doesn't say it anywhere. It says that it's dedicating... In the covenants it says easements on the plat for drainage are for the benefit of the owners of the lot and may be used by the county for the benefit of the owners as well as the general public. So it says that this is an easement. It's for drainage and it's for the public. It's been used by the public. It was offered to VDOT. And they're assessing a tax for it. The Ocean Island case I think is most on point in that they found the scheme, the full scheme of the plat to be an offer. And they found the consistent public use for 35 years to be the acceptance. So the definition of an easement is the right to use someone else's land for a specific purpose. And that's what we have here. We have the right to use private property for a specific purpose. And with the right comes the responsibility. And if it wasn't a clean water background to this, then they would have replenished the riprap. They did so in 2014. One of the first aversions in our complaint was that they repaired the same identical easement on the cul-de-sac behind the subject property. And that's the same that's also a state road. And it's also what they claim is VDOT's obligation. So at that time in 2014 or at least in 2011 when Chief Judge went on the bench, the understanding was that the county repaired the horizontal easements. And they did so on the neighboring cul-de-sac, even though now in their post-policy shift they're claiming that they don't have responsibility for anything. So in the grand scheme of things ultimately there's a good reason and there's a real reason. And the real reason is that there was a policy change 40 years after this plat went to record. And so if we're going to look at this plat in an honest, sober search for truth, then we're going to understand it was written five years after the Burns decision which eviscerated the dedication by plat statute in Virginia to just surface rights. And they took broad surface rights, broad as possible surface rights, using words beyond what was available in the statute. And then they incorporated by reference the covenants, which said point blank, it's an easement for public use. And then they used it as an easement for public use on that time. Thank you, Mr. Sherman. I want to thank both counsel for their arguments this morning. We'll come down and greet you as we move on to our second case.
judges: Albert Diaz, Paul V. Niemeyer, Matthew James Maddox